## PHILLIPS PETROLEUM CO. v. PAYNE OIL CORPORATION.

### No. 2972.

Circuit Court of Appeals, Tenth Circuit.

Dec. 15, 1944.

Don Emery, Rayburn L. Foster, R. B. F. Hummer, and D. E. Hodges, all of Bartlesville, Okl., for appellant.

Wilbur J. Holleman, of Tulsa, Okl., for appellee.

Before PHILLIPS, BRATTON, and MURRAH, Circuit Judges.

PHILLIPS, Circuit Judge.

On September 29, 1931, Payne Oil Corporation [1] was the owner of a valid and subsisting community oil and gas lease covering the greater portion of Block 71 in Shields' South Oklahoma City Addition to Oklahoma City, Oklahoma. On that date, it assigned the lease to the Phillips Petroleum Company.[2]

The assignment provided that Phillips should pay to Payne the proceeds from the sale of one-eighth of the seven-eighths working interest in the oil, gas, and casinghead gas produced from the lease, after deducting from such proceeds one-eighth of the "cost and expense of operation of" such lease "for oil and gas purposes," and that the "cost and expense of drilling and equipping any well or wells to the tanks" should "not be deemed to be a part of such cost and expense of operation."

On October 18, 1932, Phillips completed a well on the lease in the Wilcox formation at a depth of 6,547 feet. The initial production on the date of completion was 2,011 barrels of oil in four hours and gas at the rate of 72 million cubic feet in 24 hours. The well continued to produce for a period of approximately 10 years, although Phillips encountered considerable difficulty in production operations from time to time and lost an appreciable quantity of equipment in the hole. In the latter portion of the period of production, the clean-out operations of Phillips became less and less effective and production declined from month to month until in December, 1941, the daily average was 67 barrels, in January, 1942, 52 barrels, and in February, 1942, 36 barrels. The equipment lost and remaining in the hole in February, 1942, consisted of 17 feet of 4¾-inch liner and a complete string of 3½-inch drilling tools 48 feet in over-all length. Having failed in its efforts to restore the well to normal production, Phillips, on September 5, 1941, filed with the Board of Adjustment of Oklahoma City, Oklahoma, an application

---

[1] Hereinafter referred to as Payne.

[2] Hereinafter referred to as Phillips.

for a permit to drill a second well on the lease, representing that in the event the second well should be completed as a producer, Phillips would plug either the first well or the second well, so as to comply with the ordinances of Oklahoma City permitting only one well to a city block. It submitted to Payne a copy of Phillips' interoffice "Authorization for Expenditure" reflecting the estimated cost of drilling the second well, and inquired whether Payne would be willing to bear one-eighth of the expense thereof. Payne advised Phillips that it was unwilling to bear any portion of such expense and directed its attention to the provision of the assignment. Phillips' application for a permit to drill a second well was denied September 22, 1941. On October 10, 1941, Phillips appealed from the denial to the district court of Oklahoma County, Oklahoma. It dismissed its appeal, without prejudice, on November 6, 1941.

On March 6, 1942, Phillips plugged off the producing formation in the well and pulled the 7-inch casing to a depth of 5,612 feet. The 9⅝-inch casing was set at 5,540 feet. On March 30, 1942, a whipstock was set in the hole at 5,560 feet and, for a period of 15 days, Phillips attempted to deviate the hole by drilling past the whipstock, but was unsuccessful in the operation because of the character of the formation in which it was attempted. On April 15, 1942, Phillips plugged the well back to a depth of 5,479 feet and milled an 18-foot window in the 9⅝-inch casing from a depth of 5,461 feet to a depth of 5,479 feet. That operation was completed April 21, 1942. A whipstock was then set at 5,479 feet in the 9⅝-inch casing. The well was drilled directionally from such depth to 6,539 feet. The bottom of the new hole is approximately 130 feet distant horizontally in the Wilcox formation from the bottom of the hole of the original well. The initial daily potential production from the new hole was 166 barrels of oil with no water.

As a part of the operations above described, Phillips pulled the bottom hole pump and tubing from the original well, removed the oil string of casing therefrom, and sent the pump to its warehouse for overhauling. Upon completing the directional drilling to the Wilcox formation, the well was cased with an oil string and the pump was again placed in the hole. While the tank battery, surface production equipment, and connecting lines remained in place, no oil was produced from the well between March 6, 1942, and July 22, 1942, and Phillips made no effort to produce any oil from the well during that period. The drilling and operations incidental thereto, above described, cost $52,973.62. Phillips charged one-eighth of such expense, or $6,621.70, to the account of Payne, and withheld that amount from the proceeds of Payne's proportionate part of the oil runs.

Payne brought this action against Phillips for an accounting of its one-eighth of the working interest in the oil, gas, and casinghead gas produced and marketed from the lease, less the cost and expense of operation properly chargeable to Payne under the contract.

From a judgment in favor of Payne for $6,621.70, with interest at six per cent per annum from February 3, 1944, Phillips has appealed.

The sole question presented is, whether, under the assignment, Payne is liable for the expenses withheld by Phillips.

There was expert testimony on both sides which would have warranted the trial court in concluding either that such expenses were drilling expenses, or, on the other hand, operation expenses. A witness possessed of special training, experience, or observation in respect to the matter under investigation may testify as to his opinion when it will tend to aid the jury in reaching a correct conclusion.[3] And where a written contract contains words or expressions of a technical nature employed in a particular business or industry, persons familiar with such business or industry may testify as to whether the words or expressions used have acquired a well-recognized meaning among those engaged in such business or industry, and if so, what it is, for the purpose of aiding the court in ascertaining the intentions of the parties to the contract.[4]

[3] United States Smelting Co. v. Parry, 8 Cir., 166 F. 407, 410, 411; Farris v. Interstate Circuit, 5 Cir., 116 F.2d 409, 412; Eustis Packing Co. v. Martin, 5 Cir., 122 F.2d 648, 649; Securities and Exchange Commission v. Thomasson Panhandle Co., 10 Cir., 145 F.2d 408. Cf. Cooper v. Ohio Oil Co., 10 Cir., 108 F.2d 535.

[4] Winemiller v. Page, 75 Okl. 278, 183 P. 501, 503; Smith v. Ferguson, 96 Okl. 150, 221 P. 447, 450; Sterling Milk

The court concluded that the expenses of directional drilling and those incident thereto were properly classified as drilling expenses. That finding is not without substantial support in the evidence and is not clearly erroneous.

Phillips utilized 5,479 feet of the old hole and drilled a new hole a distance of 1,060 feet to a point 130 feet horizontally from the bottom of the old hole. The result of the operations was, in fact, a new oil well, although a portion of the old hole was utilized. The result would not have been different if an entirely new hole had been drilled. Under the assignment, Phillips was to bear the cost and expense of drilling and equipping any well or wells. We agree with the conclusion of the trial court that, under a fair consideration of the contract, what Phillips did must be regarded as the drilling of a well rather than the operation of a well.

Accordingly, the judgment is affirmed.

Products Co. v. O. K. Coop. Ass'n, 184 Okl. 71, 84 P.2d 610; Eustis Packing Co. v. Martin, 5 Cir., 122 F.2d 648, 649;

Manhattan Oil Co. v. Mosby, 8 Cir., 72 F.2d 840, 845.